Filed 1/26/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOEL PRANEET SIAM,<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF<br>ORANGE COUNTY,<br><br>    Respondent;<br><br>THE PEOPLE,<br><br>    Real Party in Interest. | G065447<br><br>(Super. Ct. No. 22HF0431)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Huy Nguyen, Judge. Petition granted in part and denied in part.

The Gilliland Firm and Douglas S. Gilliland; Christine Martin Law and Christine R. Martin for Petitioner.

No appearance for Respondent.

Todd Spitzer, District Attorney, and Matthew O. Plunkett, Deputy District Attorney, for Real Party in Interest.

\*          \*          \*

After the trial court denied his motion for pretrial mental health diversion pursuant to Penal Code section 1001.36, and subsequently denied him relief from the resulting order, defendant Joel Praneet Siam filed a petition in this court seeking a writ of mandate directing the trial court to grant his motion or provide other appropriate relief.[1] He argues the trial court erred in concluding he does not meet two diversion suitability criteria, one concerning whether the symptoms of his diagnosed mental health disorders would respond to treatment, and the other concerning whether he will pose an unreasonable risk of danger to public safety if treated in the community. We agree. Regarding responsiveness to treatment, the court applied the wrong legal standard when it effectively overrode the opinion of the only qualified mental health expert who weighed in on the issue. As for risk of danger, the court relied on various factual findings which are not supported by substantial evidence, and the remaining evidence is insufficient as a matter of law to support the court's conclusion. Because the court did not make findings concerning the two remaining suitability criteria, and expressly did not determine whether to exercise its residual discretion to deny diversion even if Siam was found to be eligible and suitable, we issue a writ of mandate directing the court to vacate its order denying mental health

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

diversion and hold further proceedings to reconsider the motion consistent with section 1001.36 and this opinion.

## FACTS

Facts relevant to the petition before us concern two separate incidents, each of which resulted in the filing of criminal charges against Siam. The first incident occurred in San Diego in August 2020 (San Diego offense). The second incident, from which this case stems, occurred in Newport Beach in March 2022 (current offense). The following sets forth the relevant factual and procedural background related to each offense.

### I.

### SAN DIEGO OFFENSE

*A. Circumstances of the August 2020 San Diego Offense[2]*

In the early morning hours of August 5, 2020, San Diego Harbor Police received a call from a taxi driver who reported a man who was his passenger, later identified as Siam, struck him three or four times in the back of the head with a skateboard and then fled by jumping out of the moving taxi. A little more than ten minutes later, police received a call from a hotel indicating a man matching the description given by the taxi driver was screaming and pressing the fire alarm in an elevator. When officers arrived at the hotel, they found Siam naked, laying on his stomach inside the elevator with his eyes closed and hands behind his back. He was "sweating profusely" and "yelling unintelligible phrases." While being transported for medical evaluation, Siam spontaneously told the paramedic "he hit the cab

---

[2] The facts we recite are taken from a police report concerning the August 2020 incident which was presented to the trial court for consideration in making a decision on Siam's diversion motion in the present case.

driver in the head with his skateboard, jumped out of the moving vehicle, jumped off a bridge at the airport, and ran across the street." He also said "he took off his clothes in the elevator because people told him to and that he had breathed in meth particles in the air."

B. *July 2021 Evaluation by Dr. Robert Kelin*

On July 29, 2021, Siam was evaluated by Dr. Robert Kelin, a licensed psychologist. A report written by Dr. Kelin, dated the same day, detailed the evaluation process, Siam's background and answers to questions about various topics, as well as Dr. Kelin's observations, interpretation of test result findings, diagnoses, opinions, and recommendations.

Siam self-reported he "never" had problems with anger throughout his life and had never been in a fight or engaged in aggressive behavior. He believed the San Diego offense stemmed from either the paranoid thoughts he had been having that day or someone "spiking" the drinks or food he had earlier that day. In describing what took place, he said "he had very little recollection of the incident, as that day everything was blurry." But, he recalled eating some food while waiting at a hotel where he rented a room for his father and him to stay. He was not feeling good, so he went to sleep. When he awoke, "he felt strange and may have been hallucinating."

Dr. Kelin diagnosed Siam with paranoid schizophrenia and noted it was "in partial remission with medication." He also indicated he wanted to rule out two additional diagnoses: bipolar disorder with psychotic features and alcohol use disorder. In interpreting findings, Dr. Kelin explained the testing "did not find Mr. Siam to be a violent or aggressive individual," "there were no stories that were violent," "there were no violent or explosive percepts," and "there were no indications of aggressiveness." As a result, he

4

opined Siam's "aggressive behavior in the [San Diego] offense reflected his paranoid thoughts." He further opined the offense stemmed from "a paranoid break, where [Siam] was fearful and delusional," "was experiencing paranoid thoughts[,] and was unable to maintain proper behavior." Although he did not view Siam as cured, Dr. Kelin believed that at the time of the evaluation he was "functioning appropriately" as a result of psychotropic medication.

In discussing recommended future treatment, Dr. Kelin emphasized the need for Siam "to stay on his psychotropic medication," as well as participate in regular therapy. Regarding the latter, he explained therapy would assist by ensuring medication would continue to help Siam, and if he were to have any "changes in his mental health, his psychotropic medication could be adjusted." Dr. Kelin also recommended Alcoholics Anonymous participation and periodic drug testing, both to determine whether Siam needed treatment in those areas.

*C. Mental Health Diversion*

Siam was charged in San Diego County with felony assault with a deadly weapon (§ 245, subd. (a)(1)). He filed a motion for mental health diversion under section 1001.36, supported, in part, by Dr. Kelin's report. The prosecution indicated it was not opposed to Siam's request. In mid-October 2021, the trial court granted diversion, subject to, among other conditions, compliance with treatment and monthly treatment updates to the court.

After the March 2022 current offense giving rise to the charges in this case, the trial court in San Diego County revoked Siam's mental health diversion and reinstated criminal proceedings.

5

## II.

### CURRENT OFFENSE

*A. Circumstances of the March 2022 Current Offense*[3]

Around 9:20 a.m. on March 10, 2022, City of Newport Beach police received a phone call from employees of a car dealer who reported a man, later identified as Siam, entered their showroom, caused damage to a Rolls Royce, and then fled. When officers arrived on the scene, an employee explained Siam entered the showroom barefoot and said he wanted to buy a car with cash. He was fidgety and acting erratic. When asked which one he wanted to buy, Siam replied, "all of them." He then asked if he could see inside a Rolls Royce parked in the showroom and became fixated on the hood ornament which appeared when the vehicle was unlocked. Siam proceeded to "rip[] it off the hood of the vehicle." When asked why he did it, he made "a variety of statements that did not make any sense and stated that his father would pay for the damage[]." The employee was able to get back the hood ornament before Siam left. Officers were given video footage of the incident.

About 40 minutes later, around 10 a.m., Newport Beach police received another call about an incident involving a man who was later identified as Siam. A 60-foot yacht had been stolen from a dock in Newport Beach harbor and witnesses observed the yacht crash into docks and other moored boats, do two large loops while going full speed in reverse, and then proceed forward toward a bridge. It ultimately crashed into a seawall and stopped in the middle of the channel. Officers who reached and boarded the

---

[3] The facts we recite are taken from police reports concerning the March 2022 incident which were presented to the trial court for consideration in making a decision on Siam's diversion motion.

yacht shortly thereafter found Siam near the helm and "acting very erratic." They arrested him without incident. While being transported, Siam "spontaneously stated he had taken Xanax and had drank multiple alcoholic beverages."

Police officers later interviewed two witnesses who encountered Siam around the dock area before the yacht was stolen. The first, an employee of a business that shared the dock where the yacht was moored, was working inside when Siam "walked down a flight of stairs and entered the office." Siam was friendly and identified himself as "'Slater, from the Hoag Classic.'" Siam did not appear "drunk or 'out of it,'" but in hindsight the employee though maybe he had been "'on an upper'" based on the way he behaved. The two talked for approximately 10 minutes. Siam followed the employee out to the dock area and shortly thereafter the employee lost sight of him. The second, a person employed to clean the stolen yacht, told police he saw a shoeless Siam, whom he did not recognize, unhooking lines from the dock. Siam asked him a question, and the person walked away after answering. Less than five minutes later, he returned to the area and the yacht was gone.

One person was injured during the incident. Specifically, a woman was in the galley of her sailboat when it was hit by the stolen yacht. The side of the boat "crashed in on her[,] throwing her down to the deck" and causing her to contact various solid objects, including a stove. She was again knocked down when her boat's mast collapsed. Later that day she sought treatment at a hospital for a concussion, contusions to the back of her head, and bruises on, and pain in, various parts of her body.

*B. March 2022 Evaluation by Orange County Behavioral Health*

On March 11, 2022, while in jail, Siam was evaluated by County of Orange correctional mental health care staff and transferred to a psychiatric unit. A registered nurse observed he was "disheveled," "[h]is speech was hyperverbal, rapid, and rambling," and "[h]e verbalized multiple delusions." Dr. Haider, a licensed psychiatrist, made similar observations. Based on the evaluation, Dr. Haider explained that if Siam were to be released at that time he likely would meet "gravely disabled" criteria and be placed on a Welfare and Institutions Code section 5150 hold at a designated facility. However, he found Siam was "not a danger to [him]self" and "not a danger to others." At the time of the evaluation, Siam "refused to start any antipsychotic or mood stabilizing medication that was offered."

About two weeks later, Siam was released on $50,000 bail.

*C. July 2023 Evaluation by Dr. Lisa Grajewski*

In early July 2023, licensed psychologist Dr. Lisa Grajewski conducted a six-hour evaluation of Siam. Thereafter, she spent approximately seven hours reviewing documents—e.g., police reports, criminal history information, Dr. Kelin's and Dr. Haider's reports, and other medical information—and writing a report. Siam submitted Dr. Grajewski's 23-page report, dated February 12, 2024, alongside his mental health diversion motion.

Siam self-reported that prior to the San Diego offense, he had not experienced any hallucinations or delusions. He attributed his actions during the current offense to a change in medication which occurred about a week prior. On the day of the offense, he "was having a panic attack" so he took his prescribed antidepressant. He remembered walking to the car dealership, but not much after that, aside from feeling "as though he were in a video game."

Records reviewed by Dr. Grajewski indicated Siam was prescribed various medications and received therapy between the time of the San Diego offense and the current offense. Regarding medication, in March 2021, Siam was prescribed various medications after being diagnosed with adjustment disorder, panic disorder, and generalized anxiety disorder. Those medications "were subsequently discontinued" and he was prescribed different ones on March 1, 2022, nine days before the current offense. As for therapy, Siam attended six therapy sessions between January and the first week of March 2022, with the last session taking place six days before the current offense.

Based on her evaluation, Dr. Grajewski concluded Siam "has not had [a] correct diagnosis to treat his symptoms"; he had been "undermedicated and likely misdiagnosed." Focusing on the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), she diagnosed him with bipolar disorder, generalized anxiety disorder, and panic disorder, and she noted a history of alcohol and cannabis use. She opined that at the time of the current offense, Siam "was in a manic episode due to untreated symptoms of bipolar disorder" and "was undermedicated due to difficulty with side-effects of medication." This "precluded [him] from being able to control impulses or make rational decisions."

Specifically concerning mental health diversion, Dr. Grajewski opined Siam met all the criteria for it: his mental disorders were not excluded by statute; they played a significant role in the commission of the current offense; he would respond to treatment; he consented to participating in the diversion program and agreed to comply with his treatment plan; and "he would not pose an unreasonable risk of danger or physical violence to public safety, nor is he at risk of committing a super strike." Regarding the latter,

9

she explained "there [was] no indication of violence or aggression [during Siam's] adolescence or childhood, which is where violence begins," and testing indicated "Siam does not hold traits related to anger." The risk assessment performed showed he was low-risk for recidivism, and the support he has from immediate and extended family "is a positive indicator for a favorable prognosis." Dr. Grajewski also noted he had "complied with expectations" since being out of custody.

In closing, Dr. Grajewski relayed her belief "Siam can comply with the demands and expectations of the [c]ourt, and it is in his best interest to remain out of custody in order to further treat his mental and physical health."

*D. Siam's Motion for Mental Health Diversion and The People's Opposition*

In May 2024, Siam filed a motion for an order granting mental health diversion. Among the documents filed with the motion were Dr. Kelin, Dr. Haider, and Dr. Grajewski's reports, as well as police reports concerning the San Diego offense and current offense.

The prosecution opposed the motion, focusing on whether Siam would be able to comply with the terms of mental health diversion and whether he posed an unreasonable risk of danger to public safety. First, it argued Siam "had his opportunity to treat in the community" when granted mental health diversion on the prior San Diego offense, but it was "a catastrophic failure." Second, it urged the court to deny the motion based on the circumstances of the offense alone because Siam "cause[d] a massive amount of damage to property and person in a dangerous and reckless manner that put lives in jeopardy," and "the manifestation of [Siam's] illness under the . . . circumstances [were] particularly heinous." Third, it asserted the details of the San Diego and current offenses showed Siam has "a

10

propensity to use weapons in the enactment of violence against complete strangers" and, thus, he presented "an unreasonable risk of committing a super strike." The prosecution supported its opposition with documents concerning property loss and replacement costs, police reports relating to the current offense, and a rap sheet for Siam. No expert reports or professional opinions were provided.

*E. Siam's September 2024 Relapse*

At the end of 2024, while Siam's diversion motion was pending, his counsel filed supplemental papers with the court concerning a relapse Siam experienced in September 2024. His counsel conveyed Siam started to have manic feelings, and his parents noticed them too, so Siam agreed to go to the hospital and undergo a voluntary 72-hour in-patient evaluation and treatment. About ten days after his release, he "still was not feeling right," so he drove himself to a medical center. He voluntarily completed a 60-day intensive outpatient program, after which he remained stable and resumed his normal weekly therapy sessions. Among the supporting documents provided were medical records from the hospital and completed program.

*F. Trial Court's Ruling*

The trial court held a hearing at which it heard two victim impact statements relating to the current offense and argument from both sides. It ultimately denied Siam's motion, finding he was eligible but not suitable for diversion under section 1001.36.[4] The court hinged its suitability determination on two suitability criteria: (1) whether Siam would respond to

[4] The court acknowledged it had residual discretion to deny diversion even if all statutory eligibility and suitability criteria were met, but concluded it did not need to reach the issue of residual discretion since it found Siam unsuitable.

treatment; and (2) whether Siam presented an unreasonable risk of danger to public safety if treated in the community.

Regarding treatment, the trial court stated "the one criteria that [it had] the biggest issue with [was Siam's] response to treatment." It explained: "Regardless of what any doctors can say, that a person can respond to treatment with this type of treatment and describe what type of treatment that a person can respond to—doesn't really cut it. . . . [¶] He has a history of refusing treatment, and when he had the chance to receive treatment from mental health diversion, he failed. And I understand the misdiagnosis. I understand that. But the failure was not in the misdiagnosis. The misdiagnosis had nothing to do with Mr. Siam's actions on the case. [¶] Mr. Siam himself in his own words told—as reported, taken Xanax and drank multiple alcoholic beverages. And I saw photos . . . What does the Xanax and multiple alcoholic beverages have to do with misdiagnosis? Nothing." The court also expressed concern about Siam's failure to seek an adjustment in medication after the misdiagnosis, equating it to refusal of treatment: "So even if I were to take that as the truth that it was misdiagnosed, why didn't he go to someone to talk to them about how the treatment is not working, about how he is being undermedicated—not the wrong medication as you stated. Undermedicated. Why didn't he do something about it? Because, again, in hindsight, he has a history of refusing treatment."

As for the risk of danger, the trial court found Siam posed "an unreasonable risk of danger of committing a superstrike [*sic*]." In doing so, it relied on the facts underlying the San Diego offense and the current offense. Specifically, it explained hitting someone in the head with a skateboard "four to five times for no reason," and stealing a boat after taking Xanax and alcohol, are both courses of conduct that could lead to death. And given what

12

the court believed to be a history of treatment noncompliance, a future relapse would lead to similar behavior in the future.

*G. Siam's Writ Petitions*

After the trial court denied his diversion motion, Siam filed a petition in this court seeking a writ of mandate directing the trial court to vacate its denial and enter a new order granting the motion, or granting other appropriate relief. This court denied the petition without prejudice so that Siam could first seek relief in the trial court. Thereafter, Siam unsuccessfully sought a petition for writ of mandate from the trial court. A different judge than the one who decided the underlying motion concluded the record was adequate to find no abuse of discretion in the denial of mental health diversion based on lack of suitability. Siam then filed the instant writ petition seeking the same relief sought by his first petition.

## DISCUSSION

Siam challenges the trial court's denial of his mental health diversion motion, arguing the trial court abused its discretion in making findings against him on two suitability criteria—responsiveness to treatment and risk of danger. In this context, and with respect to the second criterion, he also contends the trial court erred by supplanting the opinions of three mental health professionals with its own, without any psychological or medical expert support. Although we disagree with the latter argument, we agree the court abused its discretion in making the suitability findings. Specifically, the court applied the incorrect legal standard when finding Siam's symptoms would not respond to treatment, and its dangerousness finding is not supported by substantial evidence.

13

## I.

### APPLICABLE LAW AND STANDARD OF REVIEW

Originally enacted in 2018, sections 1001.35 and 1001.36 provide for a pretrial diversion program for certain criminal defendants with mental disorders. (Stats. 2018, ch. 34, § 24.) In context, "'[p]retrial diversion' means the postponement of prosecution, either temporarily or permanently, . . . to allow the defendant to undergo mental health treatment,' subject to certain conditions." (*People v. Braden* (2023) 14 Cal.5th 791, 801.) Among the express purposes of the program is to "[i]ncrease[] diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety." (§ 1001.35, subd. (a).)

Under section 1001.36, with the exception of defendants charged with certain crimes, a trial court "may, in its discretion, and after considering the positions of the defense and prosecution, grant pretrial [mental health] diversion to a defendant . . . if the defendant satisfies the eligibility requirements for pretrial diversion set forth in subdivision (b) and the court determines that the defendant is suitable for that diversion under the factors set forth in subdivision (c)." (*Id.*, subd. (a).)

The two eligibility requirements are: (1) "[t]he defendant has been diagnosed with a mental disorder as identified in the most recent edition of the [DSM]; and (2) "[t]he defendant's mental disorder was a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b)(1)–(2).) Regarding the latter, an amendment to the statute effective as of January 2023 requires the court to "find that the defendant's mental disorder was a significant factor in the commission of the offense unless there is clear and convincing evidence that it was not a motivating factor, causal factor, or

14

contributing factor to the defendant's involvement in the alleged offense." (*Id.*, subd. (b)(2); see also Stats. 2022, ch. 735, § 1.)

If a court determines a defendant meets both eligibility requirements, it must then determine whether the defendant is suitable. (§ 1001.36, subd. (c).) "[A] defendant is suitable for pretrial diversion" if the following four criteria are met: (1) a qualified mental health expert opines the defendant's symptoms of the relevant mental disorder "would respond to mental health treatment"; (2) "[t]he defendant consents to diversion and waives [their] right to a speedy trial"; (3) "[t]he defendant agrees to comply with treatment as a condition of diversion"; and (4) "[t]he defendant will not pose an unreasonable risk of danger to public safety, as defined in [s]ection 1170.18, if treated in the community." (*Id.*, subd. (c)(1)–(4).)

If the defendant meets all eligibility and suitability criteria, the trial court "may, in its discretion," grant pretrial diversion. (§ 1001.36, subd. (a).) "The maximum period of diversion [for a felony] is two years. [Citation.] If the defendant is subsequently charged with an additional crime, or otherwise performs unsatisfactorily in the assigned program, then the court may reinstate criminal proceedings. [Citation.] 'If the defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion.'" (*People v. Frahs* (2020) 9 Cal.5th 618, 627 (*Frahs*).)

A trial court's mental health diversion determination is reviewed for an abuse of discretion. (*People v. Bunas* (2022) 79 Cal.App.5th 840, 848 (*Bunas*); *People v. Moine* (2021) 62 Cal.App.5th 440, 449.) "'A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied

15

factual findings that are not supported by substantial evidence [citation].'" (*Bunas*, at pp. 848–849.)

## II.

## SUITABILITY

We consider, in turn, the two suitability criteria relied upon by the trial court to deny Siam's diversion motion.

*A. Responsiveness to Treatment*

The first suitability criterion listed in section 1001.36 concerns whether, "[i]n the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment." (§ 1001.36, subd. (c)(1).) "Qualified mental health expert" is defined to include, without limitation, "a psychiatrist, psychologist, . . . or a person whose knowledge, skill, experience, training, or education qualifies them as an expert." (*Id.*, subd. (f)(2).)

Here, Dr. Grajewski, a licensed psychologist, expressly opined Siam's symptoms would respond to treatment. And, she elaborated: (1) "bipolar disorder can be addressed through pharmacological methods . . . and psychotherapy"; (2) "there are recognized [e]vidence [b]ased treatments that mitigate [bipolar disorder] symptoms[,] . . . provide cognitive restructuring[,] and allow the patient to increase adaptive and functional skills"; (3) psychoeducation would assist Siam and "significant people in his life" with "better understand[ing] the seriousness of his illness and the lifelong prognoses"; and (4) therapy would teach Siam "healthy coping skills around triggers that led to substance abuse."

Notwithstanding Dr. Grajewski's opinion, and the lack of any expert opinion to the contrary, challenge to her credentials, or concerns about

16

the premises of her opinion, the trial court concluded Siam's symptoms would not respond to treatment. It so concluded based on its belief that Siam had a history of declining, and not complying with, treatment.

The People defend the court's finding by relying on subdivision (e) of section 1001.36, which provides, in relevant part: "At any stage of the proceedings, the court may require the defendant to make a prima facie showing that the defendant will meet the minimum requirements of eligibility for diversion and that the defendant and the offense are suitable for diversion. The hearing on the prima facie showing shall be informal and may proceed on offers of proof, reliable hearsay, and argument of counsel." Based on this language, the People assert "the only logical conclusion is that the court can consider any type of evidence in determining whether there has been a prima facie showing of the criteria listed in Penal Code section 1001.36, subdivision (c)," including whether a defendant's symptoms would respond to treatment.

The People's reliance on subdivision (e) of the statute is misplaced. Assuming, arguendo, the hearing below was a prima facie hearing, an issue on which the parties disagree, the court's charge was still to evaluate whether Siam met the statutory eligibility and suitability criteria. (§ 1001.36, subd. (e).) Regarding treatment responsiveness, this meant the court was required to consider whether ""[i]n the opinion of a qualified mental health expert," Siam's symptoms would respond to treatment. (§ 1001.36, subd. (c)(1).)

Rather than focus, for example, on Dr. Grajewski's credibility or the validity of the facts on which her opinion was premised, the court expressly disregarded the expert's opinion and interjected its own opinion about the likelihood of Siam's symptoms responding to treatment. But the

17

court could not effectively override Dr. Grajewski's opinion with its own. Because the statute unambiguously makes clear the treatment responsiveness finding must be based on a qualified mental health expert's opinion, and not anyone else's opinion (§ 1001.36, subd. (c)(1)), the court abused its discretion by applying the wrong legal standard. (See *Bunas, supra*, 79 Cal.App.5th at p. 848.)

*B. Unreasonable Risk of Danger to Public Safety*

The last of four suitability criteria requires a finding that "[t]he defendant will not pose an unreasonable risk of danger to public safety, as defined in [s]ection 1170.18, if treated in the community." (§ 1001.36, subd. (c)(4).) As defined, this requires a court to consider whether the defendant presents an unreasonable risk of committing an offense that falls within one of eight categories of violent offenses, known colloquially as "super strikes." (See *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1149; *Bunas, supra*, 79 Cal.App.5th at p. 851, fn. 11.)

Dr. Grajewski expressly opined Siam would not pose an unreasonable risk of danger to public safety, including the commission of a super strike or physical violence. In elaborating, she stated Siam "does not hold traits related to anger," there was no indication of violence or aggression in childhood, "which is where violence begins," and he tested at a low-risk for recidivism. An additional factor she believed reduced the risk of relapse and recidivism was the support Siam has from his immediate and extended family.

Consistent with Dr. Grajewski's opinion, Dr. Kelin expressed that testing found Siam is not a violent or aggressive individual. And, Dr. Haider referred to Siam as "gravely disabled," noting he was not a danger to himself

18

or others at the time he was evaluated, which was immediately after his arrest for the current offense.

Emphasizing the prosecution did not present any medical or psychological evidence, Siam argues the trial court could not substitute in its own lay opinion, or the lay opinions of the district attorney, on the issue of dangerousness without any medical or psychological evidence to support it. While we recognize there may be a significant benefit to having rebuttal medical and psychological evidence, we cannot say the statutory scheme precludes a trial court from rendering a dangerousness finding contrary to one expressed by a mental health professional unless there is supporting medical or psychological evidence. Section 1001.36, subdivision (c)(4) states that in making a determination concerning the risk of danger posed by a defendant, "[t]he court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." It would be incongruous with this legislative direction to say, as defendant urges, that a court may consider the opinions of nonprofessionals but then may not rely on them to render a decision unless there is medical or psychological evidentiary support. This is particularly so given the expansive nature of what the Legislature has expressly authorized the trial court to consider when evaluating the dangerousness suitability criterion. Notably, other parts of section 1001.36 make clear the Legislature knows how to limit the trial court's authority vis-à-vis a qualified mental health expert. (See, e.g., *id.*, subds. (b)(1) & (c)(1).) That it did not do so in subdivision (c)(4) of the same statute indicates it did not intend any such limitation to apply in this context. (See *Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334, 343

19

[use of different words in adjoining subdivisions of statute show intended difference in meaning].)

The question remains whether the trial court's finding of an unreasonable risk of danger to public safety is supported by substantial evidence. This necessarily requires us to also consider whether factual findings relied upon in making that determination are supported by substantial evidence. It is in these areas that we find the trial court erred.

The facts relied on by the trial court to render its dangerousness finding consisted of the following: (1) Siam has a history of refusing treatment; (2) Siam has a history of not complying with treatment; (3) Siam drank multiple alcoholic beverages and took Xanax before stealing the yacht during the current offense; (4) Siam's misdiagnosis had nothing to do with his actions during the current offense; and (5) Siam hit someone on the head with a skateboard during the San Diego incident "for no reason."

1. History of refusing treatment

Regarding Siam's treatment history, there was evidence he rejected treatment on two occasions, with both being in the aftermath of one of the offenses. The first occasion was after his father bailed him out of jail from his San Diego arrest and before having ever been diagnosed with, or treated for, a mental disorder. Siam went to live with his dad, who quickly observed something was still not right with Siam. When his dad tried to get him into a program run by a minister or to see a psychiatrist, Siam would not go because "[h]e was just so paranoid and thought people were trying to kill him." The second occasion was when Siam was jailed after the current offense and in a "very manic" and "gravely disabled" state. The correctional mental health team who evaluated him, including Dr. Haider, noted "he refused to start any antipsychotic or mood stabilizing mediation."

20

Although there undoubtedly is evidence Siam twice declined some type of treatment, which the court could use to evaluate his suitability, those rejections are insufficient under the circumstances to support the court's more general conclusion that he has a history of rejecting treatment. Both instances occurred at a time when, in the opinion of mental health experts, he was experiencing a psychotic break. The first was before ever being diagnosed or treated for a mental disorder, and the second was after his initial misdiagnosis and a medication adjustment. Aside from those two instances, every other piece of evidence showed Siam's voluntary acceptance of treatment throughout the course of the more than four-year period between the initial onset of his symptoms and the time of the trial court's ruling.[5] On this record, the two outlier instances alone are insufficient to support a history of treatment rejection finding.

2. History of not complying with treatment

Similarly problematic is the trial court's finding Siam has a history of not complying with treatment. The court's finding was based on a separate determination that Siam drank multiple alcoholic beverages and took Xanax before stealing the yacht, both of which were not part of his treatment program in effect after the San Diego offense. But, as even the trial court recognized, the treatment plan from San Diego was not among the evidence before it; indeed, it is nowhere in the record before us. In addition,

---

[5] The trial court blamed Siam for not taking affirmative action to correct his medication during the time he was undermedicated, equating the inaction to a refusal of treatment. Psychological and medical diagnosis is for professionals, as is the prescription of medication. Taking medication as prescribed, even if it turns out to be the improper medication in quantity or otherwise, is not a refusal of treatment.

there was insufficient evidence from which one could conclude Siam actually consumed alcohol and Xanax before stealing the yacht. While Siam stated he did so after being taken into custody by officers, he made the statement at a time when (1) officers observed him to be "rambling" and "acting erratic," and (2) Dr. Grajewski later described him as being "in a manic episode due to untreated symptoms of bipolar disorder" which, among other things, impaired his ability to assess reality. Under these circumstances, Siam's statement was too inherently unreliable to be a basis for the court's finding. (See *People v. Collins* (2025) 17 Cal.5th 293, 307 [substantial evidence is ""evidence that reasonably inspires confidence and is 'of solid value'""].) And, although the court noted that law enforcement pictures taken of the yacht showed "multiple empty alcoholic beverages," there was no evidence linking Siam to them or indicating Siam was under the influence at the time. (See *id.* at pp. 307–308 [""conjecture, surmise, or suspicion is not the equivalent of reasonable inference and does not constitute proof""].) Notably, police reports concerning the current offense indicated it was not alcohol related.

Setting aside the court's alcohol and Xanax finding, what remained was evidence demonstrating Siam's compliance with treatment. He regularly attended weekly therapy sessions and was under psychiatric care. And all parties, including the trial court, commended him for employing the skills he learned during treatment when he had a relapse in September 2024. Siam recognized he was experiencing symptoms, voluntarily put himself into a 72-hour in-patient program, and then voluntarily completed a 60-day intensive outpatient program.

3. Misdiagnosis

Turning to Siam's misdiagnosis, the trial court acknowledged Dr. Grajewski's opinion that Siam was misdiagnosed after the San Diego offense

22

with schizophrenia instead of the bipolar disorder diagnosis she believed proper. Nevertheless, it found "[t]he misdiagnosis had nothing to do with [his] actions" during the current offense. There is no evidence to support that conclusion. Indeed, the only evidence concerning the interplay of the diagnoses and Siam's actions during the current offense showed the opposite. Dr. Grajewski opined the misdiagnosis meant Siam was not being properly medicated at the time of the offense, which, in turn, resulted in him being unable to control impulses or make rational decisions due to "severe psychological impairment." That opinion was consistent with other information she provided on bipolar disorder, which included that (1) it is "a lifelong condition . . . [which] require[s] constant monitoring by a treating psychiatrist and psychotherapist," and (2) although symptoms may wax and wane, they will ultimately return without proper medication and treatment.

4.  Hitting someone on the head with a skateboard

Lastly, the trial court found Siam hit the taxi driver in the head with a skateboard during the San Diego incident "for no reason." But the only evidence regarding why things happened indicated there was a reason, one directly linked to Siam's mental health. Specifically, although Dr. Kelin provided a different diagnosis than Dr. Grajewski, he nevertheless opined Siam's actions in San Diego resulted from paranoid hallucinations that were symptoms of his mental disorders. And all parties involved in the resulting San Diego criminal case implicitly accepted that opinion because Siam was granted mental health diversion based on an unopposed motion.

5.  Remaining evidence

Disregarding all the factual findings not supported by substantial evidence, what remains are the undisputed aspects of the two offenses, two instances of Siam declining treatment while having a continued psychotic

break in the aftermath of the offenses, and the fact that the current offense took place while Siam was being treated pursuant to a grant of mental health diversion on the San Diego offense. Although the trial court considered the latter as part of its misdirected analysis on Siam's likelihood of responding to treatment, and not specifically in relation to dangerousness, it would be legally insufficient to justify a conclusion that Siam presented an unreasonable risk of committing a super strike if treated in the community. (See *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 [substantial evidence review looks to whether there is any "reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question"].) Siam was not properly diagnosed until long after the current offense. Thus, his actions while being treated for a misdiagnosed mental disorder are not an indicator of what might occur while undergoing treatment for a different mental disorder, particularly when the evidence shows Siam was undermedicated during the former treatment. (See *Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 893–894 (*Sarmiento*) [past relapse following drug treatment insufficient to support finding person would not respond to coordinated treatment for two other diagnoses which had never been treated].) Equally insufficient are the undisputed details of the offenses and Siam's refusal to accept treatment immediately after them. While Siam clearly caused injury during both offenses, his behavior on two occasions before he was properly diagnosed and provided appropriate treatment is not enough to support a finding he poses an *unreasonable* risk of committing a *super strike* when undergoing *proper* treatment, especially in light of his lack of a criminal record outside the two offenses and his general nonaggressive and nonviolent disposition.

Because the trial court relied on factual findings with insufficient evidentiary support in rendering its dangerousness finding, and because the remaining evidence cannot, as a matter of law, support a conclusion Siam will pose an unreasonable risk of committing a super strike if treated in the community, the trial court abused its discretion in denying diversion based on the fourth suitability criterion.

## III.

### REMEDY

Siam's petition requests us to direct the trial court to grant his motion for mental health diversion or provide other just relief. However, directing the court to grant the motion would be inappropriate under the circumstances.

Given that the trial court's denial of diversion focused on only two suitability criteria, it never made findings concerning the other two suitability criteria (both of which were not disputed by the prosecution): (1) whether Siam consents to diversion and waives his right to a speedy trial (§ 1001.36, subd. (c)(2)); and (2) whether Siam "agrees to comply with treatment as a condition of diversion" (*id.*, subd. (c)(3)). In addition, the court expressly stated it was not reaching the issue of whether to exercise what is commonly referred to as a court's residual discretion to deny diversion to a defendant found to be eligible and suitable. (See *People v. Vaughn* (2024) 105 Cal.App.5th 124, 134 (*Vaughn*); *Sarmiento, supra*, 98 Cal.App.5th at p. 892; *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1080.) Accordingly, we must remand the matter to allow the court to consider those matters and make a new determination as to whether to grant or deny Siam's diversion motion.

It bears emphasizing a trial court's residual discretion is not unlimited or unconstrained. Indeed, it "must be exercised "'consistent with

25

the principles and purpose of the governing law.""" (*Vaughn, supra*, 105 Cal.App.5th at p. 135; see also *Gomez v. Superior Court* (2025) 113 Cal.App.5th 671, 679; *Sarmiento, supra*, 98 Cal.App.5th at p. 892; *People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977 ["'[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue'"].) The stated purpose of mental health diversion ""'is to keep people with mental disorders from entering and reentering the criminal justice system while protecting public safety, to give counties discretion in developing and implementing diversion across a continuum of care settings, and to provide mental health rehabilitative services.""" (*Gomez*, at p. 691.) And, legislative history confirms there is "a strong legislative preference for treatment of mental health disorders because of the benefits of such treatment to both the offending individual and the community." (*Sarmiento,* at pp. 892–893; see, e.g., Assem. Com. on Pub. Saf., Analysis of Sen. Bill No. 1223 (2021–2022) as amended June 23, 2022 [explaining statutory amendments would "ensure that more Californians receive mental health support and resources they need by safely increasing the use of mental health diversion in appropriate cases" which was needed because research showed diversion was "substantially underutilized"].) Hence, our high court's agreement that the Legislature intends diversion "'to apply as broadly as possible.'" (*Frahs, supra*, 9 Cal.5th at p. 630.) In that vein, "denial of mental health diversion using [a court's] residual discretion should be limited to those situations where the purposes of the statute would not be achieved." (*Vaughn,* at p. 138, fn. omitted.)

## DISPOSITION

The petition for writ of mandate is granted, in part. Let a peremptory writ of mandate issue directing the trial court to (1) vacate the order denying Siam's motion for pretrial mental health diversion, and (2) hold further proceedings to reconsider the motion consistent with section 1001.36 and this opinion.


DELANEY, J.

WE CONCUR:


MOTOIKE, ACTING P. J.


MOORE, J.

27